IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**LISA A. URICH,**                                    Case No. 3:18 CV 912

      Plaintiff,                                 Judge James G. Carr

      v.                                         Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                 **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Lisa Urich ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 20, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in May 2013, alleging a disability onset date of October 10, 2012. (Tr. 317-19). Her claims were denied initially and upon reconsideration. (Tr. 175-78, 180-82). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 189-90). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 9, 2015. (Tr. 76-106). On August 19, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 138-55). On October 26, 2016, the Appeals Council remanded the decision

for further consideration of medical opinion evidence, and the inclusion of new material evidence. (Tr. 163-64).

Plaintiff (again represented by counsel), and a vocational expert ("VE") testified at a second hearing before the ALJ on February 15, 2017. (Tr. 42-75). On May 10, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-28). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 2-4); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on April 20, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in 1966 making her 46 years old on her alleged onset date. *See* Tr. 49. Plaintiff had past work in inventory management for Walmart. (Tr. 53). There, she lifted and pulled approximately 50 to 100 pounds at a time. (Tr. 53, 85). Plaintiff left Walmart due to pain in her back. (Tr. 53-54). She also had past work as a licensed practical nurse. (Tr. 54, 84).

*2015 Hearing*

Plaintiff believed she could no longer work due to back pain. (Tr. 87). She took prescription pain medications to control the pain and received injections. *Id*. Plaintiff testified the injections did "not really" help relieve her pain, because they provided only short-term relief. *Id*. Plaintiff described the lower back pain as "constant" and it radiated down her sides to her hips. (Tr. 88). Plaintiff had a lumbar fusion in 2012 which she believed "actually made the symptoms worse than better." (Tr. 89). She also had pain in her shoulders and neck (Tr. 88), and numbness and tingling in her hands (Tr. 97).

Plaintiff estimated she could walk one city block, stand in one place for approximately fifteen minutes, and sit for approximately 20-25 minutes without changing positions. (Tr. 89). She had trouble pushing and pulling due to shoulder pain. *Id*. Plaintiff could not lift or carry more than ten pounds. (Tr. 90).

In a typical day, Plaintiff "slept in", watched television, and watched her grandchildren play. *Id*. Plaintiff did not babysit her grandchildren because she could not lift them without "very bad" back pain. (Tr. 96-97). She could sometimes help with the dishes, but it took her "a while". (Tr. 90). Her daughter cleaned Plaintiff's home and did her laundry. *Id*. Plaintiff's husband did the grocery shopping and she went with him approximately once per month but did not carry anything. (Tr. 91). Her husband cooked their meals *id.*, and cared for their three dogs (Tr. 93).

*2017 Hearing*

Plaintiff believed she could no longer work due to back pain which radiated to her legs, neck pain, carpal tunnel syndrome, and numbness in her fingers. (Tr. 54-56). Plaintiff also had bipolar disorder. (Tr. 57-58).

Plaintiff lived in a two-story home. (Tr. 49). She had two adult children and two grandchildren (all living outside of the home). (Tr. 49-50). She saw her grandchildren "every other day" but did not babysit them. (Tr. 50, 58-59). Plaintiff could not pick up her infant grandchild due to back pain. (Tr. 58).

Plaintiff had a driver's license and drove a few times per week "for short periods". (Tr. 51). During an average day, Plaintiff sat in her recliner and napped until her daughter and grandchildren came over in the afternoon. (Tr. 59-60). Plaintiff estimated she could stand for approximately ten to fifteen minutes at a time and sit for 20-25 minutes. (Tr. 61-62). She could not lift more than ten pounds with both hands. (Tr. 62). She had trouble buttoning and could not open a bottle of water

3

due to numbness in her fingers. (Tr. 63). Plaintiff could not wash her hair due to shoulder pain and did not perform any household chores. (Tr. 63-64).

Relevant Medical Evidence[1]

*Physical Impairments*

In October 2012, Plaintiff underwent a decompressive laminectomy with a posterior lumbar interbody fusion, posterior non-segmental instrumentation, and an insertion of an intervertebral device. (Tr. 472). At a post-operative visit later in October with orthopedist J. Andrew Huddleston, D.O., Plaintiff reported general improvement, had 6/10 pain, tolerated her pain medication well, and was "full weight bearing" without any assistive devices. (Tr. 537). At a November post-operative visit, Plaintiff reported 7/10 pain with a "fair" response to her pain medication. (Tr. 539). She remained "full weight bearing" with no assistive devices, but Dr. Huddleston listed her work status as "no work/activity". *Id*.

Plaintiff had a third post-operative visit with Dr. Huddleston in January 2013. (Tr. 541-43). She reported "constant" 5/10 pain. *Id*. On examination, Plaintiff had "acceptable" range of motion, normal muscle strength, normal gait, and diffuse tenderness over the lumbar spine. (Tr. 542). Dr. Huddleston instructed her to avoid heavy lifting for three months. (Tr. 543).

Later in January 2013, Plaintiff saw Diana Rodriguez, C.N.P., a nurse practitioner at a neurology clinic, for lumbar back pain. (Tr. 586). Plaintiff reported pain at a 5/10. *Id*. On examination, Plaintiff had a normal gait, and normal sensation. (Tr. 588). Ms. Rodriguez prescribed pain medication. (Tr. 589).

---

1. Plaintiff only challenges the ALJ's evaluation of her physical, not her mental impairments. *See* Doc. 9, at 18-26. Therefore, the undersigned only summarizes those records relevant to her arguments. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

In February 2013, Plaintiff saw John Hughes, M.D., for, *inter alia*, back pain. (Tr. 602-04). On examination, Plaintiff had normal range of motion in all joints. (Tr. 604). Later that month, Plaintiff had a normal MRI of the upper spine (Tr. 1164), and an MRI of the lower spine which showed intact hardware and post-operative erosion of the inferior L5 vertebral body. (Tr. 527). A thoracic x-ray revealed mild degenerative changes in the mid-dorsal spine. (Tr. 1165).

In April 2013, Plaintiff saw neurologist Brendan Bauer, M.D., for continued lumbar back pain that she rated as 8/10. (Tr. 558). She also reported left leg numbness and tingling. *Id*. Dr. Bauer assessed lumbar radiculopathy due to degenerative disc disease. (Tr. 561).

Plaintiff had a final post-operative visit later in April 2013. (Tr. 544). She reported 5/10 pain in her lower back which radiated to her left buttock. *Id*. Her pain was aggravated by bending, standing, walking, and riding in a car. *Id*. Dr. Huddleston told Plaintiff to return as needed. (Tr. 546).

Plaintiff saw Dr. Bauer again in April 2013. (Tr. 699-700). She reported a February 2013 lumbar injection provided immediate relief, and she continued to have no pain on her right side for approximately two weeks thereafter. (Tr. 700). Plaintiff's left side had "minimal relief" following the injection however. *Id*. She rated her left-side pain at 8/10 immediately following the injection. *Id*.

In October 2013, Plaintiff saw Dr. Bauer for continued lumbar pain, pain between her shoulders, and bilateral arm weakness. (Tr. 695). On examination, Plaintiff had decreased sensation in both legs and positive straight leg raises. (Tr. 696). A lumbar spine x-ray the following day was unremarkable. (Tr. 710). Plaintiff also underwent an MRI that month, which revealed minimal thoracolumbar spondylosis. (Tr. 1154). Finally, Plaintiff underwent a nerve conduction

study that same month which revealed carpal tunnel syndrome and moderate bilateral cervical motor radiculopathies. (Tr. 1151).

Plaintiff had a lumbar epidural injection in January, and cervical epidural injections in March, and July of 2014. *See* Tr. 1531, 1533, 1536.

In January 2014, Plaintiff saw Dr. Hughes for a chest cold, reporting only respiratory symptoms. (Tr. 732-33). In February, Plaintiff treated at the emergency room for chest pain which radiated to her back. (Tr. 875). Providers found normal strength in all extremities and opined her chest pain was musculoskeletal. (Tr. 877).

Plaintiff returned to Dr. Bauer in March 2014 because her most recent cervical epidural injection did not relieve her pain. (Tr. 1509). On examination, Plaintiff had a normal gait and normal strength in all extremities, but had positive straight leg raises bilaterally. (Tr. 1511). Dr. Bauer observed absent reflexes in her hands and legs. (Tr. 1511-12). He noted Plaintiff's cervical disc disease was worsening and epidural injections did not provide relief. (Tr. 1512).

In April 2014, Plaintiff saw Dr. Hughes for a rash/allergic reaction. (Tr. 1075). Plaintiff also had complaints of joint and back pain. (Tr. 1076). She had a normal physical examination. (Tr. 1075-77).

A July 2014 x-ray of Plaintiff's right shoulder revealed calcification adjacent to the humeral head, suggesting calcific tendinosis. (Tr. 1062).

Plaintiff returned to Dr. Bauer's office in August 2014, seeing Ms. Rodriguez. (Tr. 1500-03). Plaintiff reported 5/10 back pain. (Tr. 1500). On examination, Plaintiff had normal strength in her extremities and normal gait. (Tr. 1502). In September, Plaintiff reported to Dr. Bauer that her lower back pain increased significantly to 8/10, and she had difficulty with ambulation. (Tr. 1526). Dr. Bauer performed a lumbar epidural injection. (Tr. 1527-28). In October, Plaintiff

reported the injection did not work and she continued to have lower back pain. (Tr. 1496). Further, she reported burning and aching in her hips at night. *Id*. Ms. Rodriguez prescribed additional pain medications. (Tr. 1498).

In January 2015, Plaintiff saw Dr. Hughes for a leg rash but otherwise reported feeling "well overall". (Tr. 1037).

Plaintiff returned to Ms. Rodriguez later in January 2015. (Tr. 1491). She reported improvement in her lower back pain, but increased pain in her thoracic and cervical spine, and shoulders. *Id*. She also had numbness and tingling in her hands and feet. *Id*. On examination, Plaintiff had normal strength in her extremities and normal gait. (Tr. 1493). Ms. Rodriguez adjusted Plaintiff's pain medications. (Tr. 1494).

In February 2015, Plaintiff saw provider Sara M. Beldon for ear pain and a cough. (Tr. 1031). She did not report any back pain symptoms. (Tr. 1033).

In March 2015, Plaintiff saw Ms. Rodriguez for increased back pain (8/10) and pain in her hands. (Tr. 1487). Plaintiff's neurological examination was unremarkable. (Tr. 1488). Ms. Rodriguez adjusted Plaintiff's pain medication and prescribed wrist splints. (Tr. 1489). Ms. Rodriguez noted she would order a functional capacity examination. *Id.*

In April 2015, Plaintiff underwent a functional capacity evaluation with physical therapist Melinda DePolo, P.T. (Tr. 1103-23). After detailing her medical history, Plaintiff reported that she was able to shower on her own, but it caused pain in her neck and shoulders. (Tr. 1104). She did not perform household chores. *Id*. Plaintiff did not engage in many leisure activities due to pain when she walked. *Id*. On examination, Plaintiff had a slow steady gait with decreased bilateral arm swing. (Tr. 1105). She had pain with her cervical and lumbar range of motion testing with 4+/5 strength and reduced range of motion in these areas. (Tr. 1106-07). Plaintiff was able to sit for 41

minutes consecutively, stand for fifteen minutes, and walk on a treadmill for three minutes. (Tr. 1114). She was able to lift eight pounds overhead, carry five pounds with front, right, and left-handed carrying. *Id*. Plaintiff did not have any difficulty reaching forward. *Id*. She demonstrated "dynamic balance deficits". *Id*. Plaintiff climbed 43 steps "with pain"; she also had pain stooping, crouching, kneeling, and stooping. *Id*. Plaintiff had below average scores in fine motor coordination testing bilaterally. (Tr. 1115).

Plaintiff returned to Ms. Rodriguez in May 2015 reporting chronic back pain with weakness and cramping through both legs. (Tr. 1483). On examination, Plaintiff had a normal gait, and full strength in her extremities. (Tr. 1485). Dr. Bauer performed another lumbar epidural injection in June 2015 (Tr. 1524), but she returned to Ms. Rodriguez in July reporting continued pain (7/10) and extremity weakness (Tr. 1478). Her examination findings were unchanged at the July visit and Ms. Rodriguez recommended another epidural injection. (Tr. 1480).

*After Date Last Insured*

In October 2015, Plaintiff saw Ms. Rodriguez reporting that her back pain was "acting up" again. (Tr. 1474). She rated her back pain at 3/10 during the visit, but stated it was at 5/10 just prior to the visit. *Id*. Plaintiff reported that her last cervical epidural injection improved her pain for approximately one month, increasing thereafter. (Tr. 1476). On examination, Plaintiff had a normal gait, and normal strength in her extremities. *Id*.

In January 2016, Plaintiff returned to Dr. Bauer for increasing neck pain. (Tr. 1514). She received another cervical epidural injection during this visit. (Tr. 1516). In February 2016, Plaintiff reported "little relief" from the injection with even stronger back and neck pain (8/10). (Tr. 1468, 1469). Examination revealed normal gait, but positive straight leg raises. (Tr. 1471). In May, Plaintiff returned to the neurology clinic and reported 8/10 pain in her neck and back to Jenna

Lizzi, PA-C. (Tr. 1463). She no longer wanted epidural injections because they did not provide relief. (Tr. 1464). Plaintiff returned to Dr. Bauer in October 2016 for lumbar and cervical pain radiating to all extremities with numbness and tingling in the lower extremities. (Tr. 1451). Dr. Bauer assessed radicular pain and paresthesia in the upper and lower extremities. (Tr. 1454). He adjusted Plaintiff's pain medications. (Tr. 1455).

A sensory nerve conduction study completed in February 2017 revealed bilateral chronic C5/C6 radiculopathy (moderate). (Tr. 1961-63). It also showed "evidence of an entrapment neuropathy such as carpal tunnel syndrome" bilaterally, moderate in nature. (Tr. 1963).

Opinion Evidence

*Treating Physician*

In May 2015, Dr. Bauer completed a spinal impairment questionnaire. (Tr. 1124-29). In it, he listed Plaintiff's diagnoses and referenced the attached[2] "FCE", when asked about the imaging and diagnostic testing which supported them. (Tr. 1124). It is presumed his reference is to the 22 physical tests run by Ms. DePolo during her April 2015 functional capacity examination (which his clinic referred Plaintiff for). *See* Tr. 1107. When asked to provide an opinion regarding Plaintiff's physical limitations, Dr. Bauer referred to the findings within the functional capacity examination. *See* Tr. 1124 ("see FCE attached"); Tr. 1125-28 ("see attached").

Dr. Bauer completed another disability impairment questionnaire in December 2015. (Tr. 1969-73). Dr. Bauer opined Plaintiff could not remain in a seated position for more than one hour

---

2. In his evaluation of Dr. Bauer's opinions, the ALJ notes that the functional capacity evaluation was not attached to Dr. Bauer's May 2015 opinion as he indicated. (Tr. 25). However, in comparing the fax machine stamps at the bottom right corner of the pages in the evaluation to the pages in Dr. Bauer's May 2015 opinion, it appears they were faxed to Plaintiff's attorney together on May 5, 2015. *See* Tr. 1103-29. Moreover, they are both part of Exhibit 20 as presented to the ALJ. *See id.*

during an eight-hour workday. (Tr. 1971). Similarly, he found she could not stand for more than one hour in an eight-hour workday and needed to be able to rise from a seated position to move around every half hour. *Id.* When asked to evaluate Plaintiff's lift and carry abilities, Dr. Bauer wrote "see FCE", presumably again referencing Ms. DePolo's April 2015 functional capacity evaluation. *Id.* Dr. Bauer found Plaintiff could occasionally[3] grasp, turn, and twist objects; but could never reach, handle, or finger. (Tr. 1972). He opined Plaintiff would need frequent breaks and wrote "no work" when asked how long Plaintiff would need to rest before returning to work. *Id.* Finally, Dr. Bauer opined Plaintiff would likely be absent from work more than three days per month due to her impairments. (Tr. 1973).

In March 2017, Dr. Bauer wrote a letter in which he repeated the same limitations from in his December 2015 opinion. (Tr. 1968). He explained, "[t]he limitations described in my disability impairment questionnaire dated January 8, 2015[4] are still an accurate reflection of my patient's condition." *Id.*

*Examining Provider*

In April 2015, Ms. DePolo opined Plaintiff was not able to work due, in part, to her inability to tolerate prolonged sitting or standing. (Tr. 1122). She opined Plaintiff should not lift or carry objects overhead, could not carry more than five pounds on her right or left side, could not stand for more than fifteen consecutive minutes, could not sit for more than 41 consecutive minutes, and could not climb more than 43 consecutive stairs. *Id.*

---

3. The form defines "occasionally" as an activity that lasts "up to 1/3 of an 8-hr day". (Tr. 1972).
4. This appears to be a typographical error as there is no January 8, 2015 opinion in the record.

*State Agency Physicians*

In August 2013, State agency physician Esberdado Villanueva, M.D., reviewed Plaintiff's medical records and provided a physical residual functional capacity assessment. (Tr. 115-17). He opined Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry less than ten pounds; stand and/or walk for six hours of an eight-hour workday; and sit for six hours of an eight-hour workday. (Tr. 115). She could occasionally climb ramps and stairs, balance, stoop, kneel, or crouch. (Tr. 116). Plaintiff could never climb ladders, ropes, or scaffolds, and never crawl. *Id.* In March 2014, State agency physician Maria Congbalay, M.D., concurred with Dr. Villanueva's findings except that she found Plaintiff could frequently lift ten pounds and she limited Plaintiff to avoiding exposure to hazards. (Tr. 129-31).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 70-73. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. (Tr. 71-72). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a stock checker, office helper, or a wire cutter. (Tr. 71).

ALJ Decision

In a written decision dated May 10, 2017, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2015 and had not engaged in substantial gainful activity from her alleged onset date (October 12, 2012), through her date last insured. (Tr. 13). He concluded Plaintiff had severe impairments of obesity; degenerative disc disease of the lumbosacral spine; C5-C6 moderate motor radiculopathy; bipolar disorder; generalized anxiety disorder; mild carpal tunnel syndrome; and alcohol abuse, but found these impairments (alone or

11

in combination with any other) did not meet or medically equal the severity of a listed impairment.

(Tr. 13-14). The ALJ then set forth Plaintiff's residual functional capacity ("RFC"):

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ramps and stairs; never climb ropes, ladders or scaffolds; occasionally stoop; never kneel, crouch, and crawl; frequently reach overhead bilaterally; frequently handle and finger bilaterally; perform simple, routine work with an SVP of 2; occasionally interact with the public and co-workers; and change position between sitting and standing every 20 minutes for 1 to 2 minutes in the immediate vicinity of the workstation.

(Tr. 17). The ALJ found Plaintiff was unable to perform past relevant work; was defined as a "younger individual" on the date last insured; and had a high school education. (Tr. 27). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id*. Thus, the ALJ found Plaintiff not disabled from October 10, 2012 (the alleged onset date), through September 30, 2015 (the date last insured). (Tr. 28).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ failed to properly evaluate: (1) Plaintiff's subjective symptoms; (2) the opinion of Plaintiff's treating neurologist, Dr. Bauer; and (3) the opinion of Dr. Villanueva, a State agency physician. (Doc. 9, at 18-26). The Commissioner responds that the ALJ's decision is supported in each instance. (Doc. 12, at 8-19). For the following reasons, the undersigned finds the Commissioner's decision regarding Dr. Bauer's opinion and Plaintiff's subjective symptoms unsupported by substantial evidence, and therefore recommends the decision be reversed and remanded for further proceedings.

Subjective Symptoms Analysis

Plaintiff argues the ALJ's assessment of her subjective symptoms is not supported by substantial evidence. Specifically, she notes the ALJ mischaracterized her testimony and the medical evidence of record when evaluating of Plaintiff's physical symptoms. For the following reasons, the undersigned agrees and recommends the decision of the Commissioner be reversed in this regard.

When a claimant alleges impairment-related symptoms, the Commissioner follows a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304, *2-8.[5] First, the ALJ must determine whether there is an underlying medically determinable

---

5. SSR 16-3p replaces SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The ALJ's decision here is dated May 10, 2017 and thus SSR 16-3p applies. SSR 16-3p clarifies the language of the pre-existing standard in SSR 96-7p, 1996 WL 374186 (1996) to the extent that it "eliminated the use of the term 'credibility' in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will not 'assess an individual's overall character or truthfulness' but instead 'focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the

14

physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that "an administrative law judge's credibility findings are virtually unchallengeable". *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal citation omitted). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms,

---

individual's symptoms and given the adjudicator's evaluation of the individual symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities...." *Huigens v. Soc. Sec. Admin.*, 718 F. App'x 841, 848 (11th Cir. 2017) (quoting *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1289-90 (11th Cir. 2017) (quoting in part SSR 16-3p)). Both rulings refer to the two-step process in 20 C.F.R. § 404.1529(c).

be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Here, the ALJ correctly identified the two-step process (Tr. 17), summarized Plaintiff's medical records (Tr. 17-24), and offered his assessment of her subjective physical symptoms:

> The alleged severity and duration of claimant's symptoms and limitations are inconsistent with the treatment history, activities of daily living, and the objective evidence from October 2012 through September 2015. The claimant required laminectomy and fusion at LS-S1. However, she made several reports to her orthopedist and neurologist that the surgery resolved her lower extremity symptoms. She was placed on temporary restrictions of no heavy lifting, and she testified when she returned to work briefly after surgery, she was lifting up to 50 pounds at Walmart. It is reasonable that this medium exertional level caused some pain, but there was no ongoing objective evidence to support less than light exertional limitations. The post-surgery MRI indicated there no residual or recurrent disc protrusions. Numerous examinations prior to the claimant's date last insured revealed normal motor and sensory findings. There were some brief and intermittent findings of some diminished sensation to lower extremities, the claimant reported these symptoms were intermittent, and a few findings of the positive straight leg raise test. However, her use of pain medications and injections were very effective in improving her pain without any significant side effects in the record. She only made some brief complaints of some mild tiredness from medications. On January 13, 2015, the claimant said her low back pain was better, she was doing well, denied any new leg weakness or paresthesia, pain was intermittent, her pain increase[d] with activity, and medications were helpful. Near the claimant's date last insured, she said she was walking, remained active, and an early 2016 examination noted normal motor, sensory, and range of motion examination. The claimant's lumbar symptoms were managed effectively during the period at issue. The claimant testified cervical injections improved her neck pain, and her only treatment for carpal tunnel was wrist splints.

> In addition to walking and being active, the record revealed the claimant cleaned her home, vacuumed, washed dishes, did laundry at the laundromat, shopped, drove, cooked, and babysat an infant and toddler after the alleged onset date. The claimant testified she was able to lift the 25-pound child. She testified she continues to see her grandchildren on a daily basis. The claimant made several reports she was babysitting grandchildren during the period issue. Caring for very young children can be quite demanding both physically and emotionally. These activities and the objective findings in the treating records supports the claimant's surgery was successful, and her residual pain and intermittent radicular symptoms were managed effectively during the period at issue.

16

(Tr. 23-24).

The ALJ gave several reasons why he believed Plaintiff's physical pain complaints were inconsistent with: her treatment history, activities of daily living, and objective evidence as required under the regulations. *Id.*; 20 C.F.R. § 404.1529(c)(3). However, as noted above, the ALJ's determination "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. Here, the undersigned finds that many of the ALJ's reasons are unsupported by substantial portions of the record. The undersigned addresses each reason in turn.

First, the ALJ asserts (without citation) that Plaintiff "made *several* reports to her orthopedist and neurologist that the surgery resolved her lower extremity symptoms." (Tr. 23) (emphasis added). This is contradicted by substantial portions of the record. Plaintiff repeatedly told her treating neurologist that she struggled with pain and sensory difficulties following surgery. *See* Tr. 89 (2015 testimony that her lumbar surgery "actually made the symptoms worse than better."); Tr. 544 (April 2013 post-operative visit where Plaintiff reported "persistent" lower back pain which radiated to her legs and that she was "always" in pain.); Tr. 539 (November 2012 post-operative visit where Plaintiff had "constant" 7/10 back pain). The ALJ next notes that "[n]umerous examinations prior to the claimant's date last insured revealed normal motor and sensory findings." (Tr. 24). Yet, in the very next sentence the ALJ states that "[t]here were some brief and intermittent findings of some diminished sensation to lower extremities, the claimant reported these symptoms were intermittent, and a few findings of the positive straight leg raise test." *Id*. Indeed, Plaintiff had several abnormal sensory examinations following surgery. *See* Tr.

560 (April 2013 examination revealing decreased sensation in the lower extremities, positive straight leg raises, and absent reflexes); Tr. 696-97 (October 2013 examination showing same); Tr. 1511-12 (March 2014 examination showing same); Tr. 1470-71 (February 2016 examination showing same). The ALJ dismisses these abnormal sensory findings with the assertion that Plaintiff's "use of pain medications and injections were very effective in improving her pain", and helped to "manage[] her lumbar pain effectively". (Tr. 24). However, the ALJ's statements here are also unsupported by substantial evidence of record. *See* Tr. 87 (Plaintiff's 2015 testimony that her back injections did "not really" help relieve pain); Tr. 700 (April 2013 visit with Dr. Bauer where she reported "minimal relief" with 8/10 pain following a lumbar injection); Tr. 1509 (March 2014 visit with Dr. Bauer where Plaintiff reported her cervical epidural injection did not help her pain); Tr. 1496 (October 2014 visit to the neurology clinic where Plaintiff reported her epidural injection "did not seem to work" and she had "increased pain" two days after the procedure); Tr. 1480 (July 2015 neurology visit where Plaintiff described her latest lumbar injection as "not helpful"); Tr. 1468 (February 2016 visit to the neurology clinic where Plaintiff reported her last injection "didn't help much"); Tr. 1464 (May 2016 neurology visit where Plaintiff stated she no longer wanted to receive epidural injections because they did not help).

As further evidence to support his credibility finding, the ALJ points to a January 13, 2015 visit[6] where Plaintiff "said her low back pain was better, she was doing well, denied any new leg weakness or paresthesia, pain was intermittent, her pain increase[d] with activity, and medications were helpful." (Tr. 24). However, the ALJ's assessment ignores that, within this very same visit, Plaintiff also reported increased neck pain and stiffness, paresthesia in her hands, and "problems

---

6. Although the ALJ does not provide a record citation for this visit, the undersigned assumes he was referencing the January 13, 2015 neurology clinic visit with Ms. Rodriguez. (Tr. 1491).

18

with her thoracic spine, cervical, and shoulders". (Tr. 1491, 1493). Plaintiff further noted continuing numbness and tingling in her hands and feet. (Tr. 1491).

Finally, in support of his credibility finding, the ALJ relies on Plaintiff's activities of daily living. (Tr. 24). Again, however, his assertion that "the record revealed the claimant cleaned her home, vacuumed, washed dishes, did laundry at the laundromat, shopped, drove, cooked, and babysat an infant and toddler after the alleged onset date" is made without record citations and is inconsistent with Plaintiff's testimony. *Id*. In 2015 Plaintiff unambiguously testified that her husband grocery shopped (Tr. 90), cooked their meals (Tr. 91), and cared for their three dogs (Tr. 93). Plaintiff's daughters cleaned her home and did her laundry. (Tr. 90). At her 2017 hearing, Plaintiff reiterated that she did not participate in any household chores. (Tr. 63-64). Plaintiff emphasized the same to Ms. DePolo at her April 2015 assessment. (Tr. 1104). The ALJ further misrepresented Plaintiff's testimony regarding the care of her grandchildren. (Tr. 24). He asserted Plaintiff testified "she was able to lift the 25-pound child", and "made several reports she was babysitting grandchildren during the period issue". *Id*. However, in 2015, Plaintiff clearly testified she did not babysit her grandchildren because she was unable to lift the infant without pain in her back. (Tr. 96-97). Plaintiff testified to the same in 2017 (Tr. 50), and stated that she was never alone with her grandchildren because she was unable to pick up the youngest (Tr. 58).

Earlier in his decision, the ALJ cites one mental health record where the provider noted Plaintiff babysat her grandchildren Tr. 15 (citing Tr. 675), one where she "helped" babysit a grandchild *id*. (citing Tr. 950), and one record where Plaintiff reported she cleaned her own home *id*. (citing Tr. 650). However, the undersigned notes these instances were early in the record (mid-to-late 2013) and, as previously discussed, Plaintiff's pain worsened, and she engaged in aggressive pain control measures since that date. Further, these accounts were nearly two years

19

before her 2015 testimony where the ALJ – referencing a July 2013 mental health visit – asked Plaintiff if she babysat her grandchildren. Tr. 58-59 (citing Tr. 1372). Plaintiff responded that she was never actually *alone* with her grandchildren. *Id*. Further, the Sixth Circuit has consistently held that the ability to participate in "minor household chores" including cleaning and driving are not inconsistent with disabling pain. *See Meece, v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006); *see also White v. Comm'r of Soc. Sec*., 312 F. App'x 779, 788-89 (6th Cir. 2009).

In support of her position, the Commissioner emphasizes the high level of deference given to an ALJ's credibility assessment, however, as she also acknowledges, this is only true when the assessment "is supported by an adequate basis". (Doc 12, at 15-16) (quoting *Walters*, 127 F.3d at 532). As discussed above in great detail, such is not the case here. An ALJ's credibility assessment must always "be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. For the reasons given above, the undersigned finds the ALJ's credibility assessment fails to establish how the ALJ arrived at his conclusion given his limited citations, and the numerous contradictions in the record. Thus, the undersigned finds that, on balance, the ALJ's assessment is unsupported by substantial evidence and recommends the Commissioner's decision be reversed and remanded for the Commissioner to re-evaluate Plaintiff's subjective symptom reports.

Treating Physician - Dr. Bauer

Plaintiff also argues the ALJ erred in his evaluation of Dr. Bauer's opinions. Specifically, she argues the ALJ's decision to assign the opinion "little weight" is not supported by substantial evidence – while the Commissioner argues that it is. For the following reasons, the undersigned

agrees with Plaintiff and recommends the decision be reversed and remanded for further evaluation of Dr. Bauer's opinions as well.

It is well accepted that medical opinions of treating physicians are accorded greater deference than non-treating physicians.[7] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the

---

7. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, after setting forth the treating physician standard, the ALJ addressed Dr. Bauer's opinions and explained the weight assigned:

> Dr. Bauer, the claimant's treating neurologist, in a May 15, 2015 treating source statement, indicated the claimant would miss more than three days [of] work per month due to chronic back pain, and referenced an attached functional capacity evaluation. However, the report did not include the functional capacity evaluation (Exhibit 20F). It is assumed that Dr. Bauer is referencing the April 13, 2015 functional capacity evaluation as discussed above. For the same reasons as mentioned above, the functional capacity evaluation is given little weight. The medical evidence and physical examinations performed by Dr. Bauer discussed in this decision does not support these extreme limitations. The opinion is not supported by sufficient documentation of evidence, lacks clear articulation for the basis of the opinions, and is not consistent with other objective medical evidence of record. The opinion also relies on the functional capacity evaluation findings that are not supported by or consistent with record. Thus, the opinion is given little weight. [***]

> On December 14, 2015, Dr. Bauer again referenced the functional capacity evaluation and opined the claimant could not sustain sedentary work, and would miss more than three days a work per month (Exhibit 24F) [].On March 1, 2017, Dr. Bauer included and referenced this same report in 2015 indicating the claimant needed to take extra breaks, and would miss more than three days [of] work per month due to her impairments (Exhibit 35F). Again, for the period at issue, the objective record, imaging studies, activities, examination findings by Dr. Bauer, and record as a whole did not support these extreme limitations. Thus, these opinions are given little weight.

(Tr. 25-26).

Here, the ALJ dismisses Dr. Bauer's May 2015 opinion, in part, because "[t]he medical evidence and physical examinations performed by Dr. Bauer discussed in this decision do[] not

support these extreme limitations." (Tr. 25). However, the ALJ does not cite any specific records here and directs the reader to search the decision for clues. As discussed above in detail, the ALJ made several statements throughout his opinion, noting Plaintiff's improvement with epidural injections, ease of conducting her daily activities, ability to babysit her grandchildren, "normal" examinations, and improvement following her 2012 lumbar surgery – all of which are heavily contradicted by Plaintiff's testimony and the record. (Tr. 23-24). Further, the ALJ found Dr. Bauer's opinion "lacks clear articulation for the basis of [his] opinions". (Tr. 25). However, in his May 2015 opinion, Dr. Bauer directed the reader to the April 2015 functional capacity evaluation where Ms. DePolo outlined her findings of the 22 separate physical tests she conducted. *See* Tr. 1124 (citing Tr. 1107)[8]. Medical source opinions completed by non-treating sources which are "later endorsed by a treating physician are typically not considered treating source opinions unless there is evidence that 'the statement presented to the ALJ represented the opinions of a team effort.'" *Miller v. Comm'r of Soc. Sec*., 2017 WL 2693536, at *7 (N.D. Ohio) (quoting *Borden v. Comm'r of Soc. Sec*., 2014 WL 7335176, at *15 (N.D. Ohio)). Here, Plaintiff was referred to Ms. DePolo for evaluation by Ms. Rodriguez, a nurse within Dr. Bauer's neurology practice. *See* Tr. 1103, 1489. Ms. DePolo then conducted extensive testing and Dr. Bauer reasonably relied on – and clearly endorsed – her results within his treating source opinions. (Tr. 1187-90, 1124-29) (May and December 2015 opinions where Dr. Bauer wrote "See FCE" when asked for functional limitations).

---

8. As noted above, in his evaluation of Dr. Bauer May 2015 opinions, the ALJ notes that the functional capacity evaluation was not attached as the doctor indicated. (Tr. 25). However, in comparing the fax machine stamps at the bottom right corner of the pages in the evaluation to the bottom right corners of the pages in Dr. Bauer's May 2015 opinion, it appears they were faxed to Plaintiff's attorney together on May 5, 2015. *See* Tr. 1103-29.

In his December 2015 opinion, Dr. Bauer devoted nearly two pages of his medical opinion to outlining Plaintiff's diagnoses, listing the clinical and laboratory findings which supported his diagnoses, her primary symptoms, medications, and an extensive list of her treatments. *See*. Tr. 1187-88. The ALJ similarly dismissed the December 2015 opinion again because "objective record, imaging studies, activities, examination findings by Dr. Bauer, and record as a whole did not support these extreme limitations." (Tr. 26). As previously discussed, this rationale falls flat.

Finally, the ALJ discredited Dr. Bauer for endorsing Ms. DePolo's April 2015 functional capacity examination findings, because the ALJ found her opinion unsupported. (Tr. 25) (citing Tr. 1103-23). The ALJ dismissed Ms. DePolo's opinion, in part, because:

> the longitudinal objective record does not support these findings. Throughout the record, the claimant had normal motor strength, ambulated normally, reported she was active and walking, was able to walk longer on the treadmill testing, was able to laundry at the laundromat, and lifted a 25-pound granddaughter.

(Tr. 25). Again, as discussed above, Plaintiff repeatedly testified she did not do her own laundry or lift her granddaughter. *See* Tr. 50, 58-59, 90, 91, 93, 96-97. Plaintiff even reported to Ms. DePolo during the examination that she did not participate in household chores (including laundry) and could not lift more than ten pounds. (Tr. 1104-05). During testing, Plaintiff could only lift eight-pound weights. (Tr. 1114). Treadmill testing revealed Plaintiff could only walk for three to five minutes at a time. *Id*. Prior to the test, she reported to Ms. DePolo that she could not walk for more than five minutes at a time (Tr. 1104), and described walking as "very painful" (Tr. 1103). The ALJ noted the "longitudinal objective record does not support [Ms. DePolo's] findings", however, he did not identify exactly what those objective findings are, or how they contradict Ms. DePolo's findings. (Tr. 25). Again, the "logical bridge" is missing. *Sarchet*, 78 F.3d at 307.

Collectively, the reasons given by the ALJ regarding Dr. Bauer's opinions make it difficult for this Court, to track his rationale. And a court "cannot uphold an ALJ's decision, even if there

24

is 'enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). And, "[p]ut simply, it is not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010). In *Hernandez v. Comm'r of Soc. Sec.*, the Sixth Circuit found sufficient an ALJ's rejection of a treating physician's opinion because it was not supported by objective medical evidence in the record "as discussed above" and noted that "[a]lthough the ALJ did not specifically identify the previously discussed objective medical evidence, it is clear which evidence he was referring to and thus strict compliance with the regulations is not necessary in this instance". 644 Fed.Appx. 468, 474 (6th Cir. 2016). Here, as discussed, it was not always clear which evidence the ALJ relied on when making his broad assumptions and, as detailed, many of the statements made are heavily contradicted by the record.

For these reasons, the undersigned finds the ALJ's assessment of Dr. Bauer's opinion falls short of providing the "good reasons" required for assigning "little weight" to Dr. Bauer's opinion. That is, his reasons are not "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. Thus, the undersigned recommends the Commissioner's decision be reversed and remanded for further consideration.

*Dr. Villanueva*

Finally, Plaintiff challenges the ALJ's assessment of Dr. Villanueva's opinion. She argues the ALJ erred in assigning the opinion "great weight" because Dr. Villanueva issued his opinion in 2013 and therefore did not have access to the three years of medical records that followed. (Doc. 9, at 21). The undersigned finds no error in the ALJ's assessment here and recommends the decision of the Commissioner be affirmed in this regard.

In the Sixth Circuit, an ALJ is not in error for affording weight to a state agency physician who did not have access to subsequent records, so long as the ALJ considered the subsequent records. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *see also McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Ruby v. Colvin*, 2015 WL 1000672, *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). Here, the ALJ expressly considered Plaintiff's treatment records from late 2013 through 2016. *See* Tr. 23-26. Because the ALJ considered the subsequent records as required, the undersigned finds no error in the ALJ's decision to give the opinion greater weight and recommends the Commissioner's decision be affirmed in this regard.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and recommends the decision be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g).

 s/James R. Knepp II
United States Magistrate Judge

26

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).